NORWALK TEACHERS' ASSOCIATION *v.* BOARD OF EDUCATION OF THE CITY OF NORWALK

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued June 14—decided July 31, 1951

*Sidney Vogel,* for the plaintiff.

*Robert B. Devine,* for the defendant.

JENNINGS, J.  This is a suit between the Norwalk Teachers' Association as plaintiff and the Norwalk board

of education as defendant for a declaratory judgment, reserved on the admitted allegations of the complaint for the advice of this court.

The complaint may be summarized as follows: The plaintiff is a voluntary association and an independent labor union to which all but two of the teaching personnel of approximately 300 in the Norwalk school system belong. In April, 1946, there was a dispute between the parties over salary rates. The board of estimate and taxation was also involved. After long negotiations, 230 members of the association rejected the individual contracts of employment tendered them and refused to return to their teaching duties. After further negotiations, in which the governor and the state board of education took part, a contract was entered into between the plaintiff and the defendant, and the teachers returned to their duties. The contract, subject to conditions precedent therein set forth, recognized the plaintiff as the bargaining agent for all of its members, defined working conditions and set up a grievance procedure and salary schedule. Similar contracts were entered into for the succeeding school years, including 1950-1951. From September, 1946, to the present, and particularly with reference to the contract for 1950-1951, much doubt and uncertainty have arisen concerning the rights and duties of the respective parties, the interpretation of the contract and the construction of the state statutes relating to schools, education and boards of education. "In addition," the complaint states, "there has been the possibility of strikes, work stoppage or collective refusals to return to work by the teachers through their organization and the possibility of discharges or suspensions by the defendant by reason of difficult personnel relations, all of which tends to disharmony in the operation of the school system and to the ever present possibility that either, or both, the

parties may be unwittingly violating statutes by reason of mistaken or erroneous interpretation thereon." The parties agreed that the contract for the school year 1949-1950 would govern their relations for the school year 1950-1951, that they would join in this action, and "that whatever contractual obligations exist will be forthwith modified so soon as they shall have received from the Court judgments and orders declaring their respective rights, privileges, duties and immunities." The specific points of dispute are stated in the questions reserved, printed in the footnote.[1]

This court is not required to advise on abstract principles of law. See *United Public Workers* v. *Mitchell*, 330 U. S. 75, 89, 67 S. Ct. 556, 91 L. Ed. 754. In the case at bar, the admitted facts show that Norwalk has

---

[1] The plaintiff claimed a declaratory judgment answering and adjudicating the following questions:

"(a) Is it permitted to the plaintiff under our laws to organize itself as a labor union for the purpose of demanding and receiving recognition and collective bargaining?

"(b) Is it permitted to the plaintiff organized as a labor union to demand recognition as such and collective bargaining?

"(c) Is it permissible under Connecticut law for the defendant to recognize the plaintiff for the purpose of collective bargaining?

"(d) Is collective bargaining to establish salaries and working conditions permissible between the plaintiff and the defendant?

"(e) May the plaintiff engage in concerted action such as strike, work stoppage, or collective refusal to enter upon duties?

"(f) Is arbitration a permissible method under Connecticut law to settle or adjust disputes between the plaintiff and the defendant?

"(g) Is mediation a permissible method under Connecticut law to settle or adjust disputes between the plaintiff and the defendant?

"(h) If the answer to the previous questions is yes, are the State's established administrative facilities, such as the State Board of Mediation and Arbitration and the State Labor Relations Board, available, as they are available in industrial disputes, to the plaintiff and the defendant?

"(i) Does the continuing contract law, so-called, create a status of employment within which the plaintiff may claim employment subject to the right to bargain salaries and working conditions?

"(j) Has the plaintiff the right to establish rules, working conditions and grievance resolution procedures by collective bargaining?"

suffered from one disrupting teachers' strike. While the complaint is couched in diplomatic language, it is obvious that the city is likely to be faced with another in the fall. Section 249 of the Practice Book authorizes the Superior Court to render declaratory judgments "as to the existence or nonexistence . . . of any right, power, privilege or immunity." It is obvious that a determination of the right of the teachers to strike comes within this definition. None of the limitations expressed in § 250 of the Practice Book prevent consideration of the issue. The other questions discussed are governed by the same principle. Question (e) will be considered first.

Under our system, the government is established by and run for all of the people, not for the benefit of any person or group. The profit motive, inherent in the principle of free enterprise, is absent. It should be the aim of every employee of the government to do his or her part to make it function as efficiently and economically as possible. The drastic remedy of the organized strike to enforce the demands of unions of government employees is in direct contravention of this principle. It has been so regarded by the heads of the executive departments of the states and the nation. Most of the text writers refer to one or more of the following statements by three of our recent presidents. They are quoted, for example, in 1 Labor Law Journal 612 (May, 1950): "There is no right to strike against public safety by anybody anywhere at any time" (Calvin Coolidge on the Boston police strike). This same strike was characterized by President Wilson as "an intolerable crime against civilization." President Franklin D. Roosevelt said in a letter to the president of the National Federation of Federal Employees on August 16, 1937: "Particularly, I want to emphasize my conviction that militant tactics have no place in the functions of

any organization of Government employees. . . . [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable." As the author of the article cited says, "The above statement by President Roosevelt, who certainly was no enemy of labor unions, epitomizes the answer to the problem. It seems to be axiomatic."

The commentators, generally, subscribe to this proposition. National Institute of Municipal Law Officers Reports No. 76, 116, 129; 1 Teller, Labor Disputes & Collective Bargaining (1947 Sup.) § 171; 18 N. Y. U. L. Q. Rev. 247; 94 U. of Pa. L. Rev. 427. Notwithstanding this fact, Ziskind was able to publish a well-documented book entitled "One Thousand Strikes of Government Employees," which contains an elaborate bibliography. See also Spero, Government as Employer. This would indicate that the law on the subject is still in the process of development.

Few cases involving the right of unions of government employees to strike to enforce their demands have reached courts of last resort. That right has usually been tested by an application for an injunction forbidding the strike. The right of the governmental body to this relief has been uniformly upheld. It has been put on various grounds: public policy; interference with governmental function; illegal discrimination against the right of any citizen to apply for government employment (where the union sought a closed shop). The following cases do not necessarily turn on the specific right to strike, but the reasoning indicates that, if faced with that question, the court would be compelled to deny that right to public employees. For example, *Perez* v. *Board of Police Commissioners*, 78 Cal. App.

2d 638, 178 P. 2d 537, held that the board could, by rule, prevent police officers from joining a labor union. If it could do this, it would certainly be upheld in an attempt to enjoin a strike called by the union. *Cleveland* v. *Division* 268 *of Amalgamated Assn.*, 57 Ohio L. Abs. 173, 176, 90 N. E. 2d 711; *Los Angeles* v. *Los Angeles Building & Construction Trades Council*, 94 Cal. App. 2d 36, 46, 210 P. 2d 305; *Mugford* v. *Baltimore*, 185 Md. 266, 271, 44 A. 2d 745, 162 A. L. R. 1101; *Miami Water Works Local No.* 654 v. *Miami*, 157 Fla. 445, 451, 26 So. 2d 194; *Railway Mail Assn.* v. *Murphy*, 180 Misc. 868, 875, 44 N. Y. S. 2d 601; *Congress of Industrial Organizations* v. *Dallas*, (Tex. Civ. App.) 198 S. W. 2d 143, 144; *Seattle High School Chapter No.* 200 v. *Sharples*, 159 Wash. 424, 429, 293 P. 994, 72 A. L. R. 1215; *People ex rel. Fursman* v. *Chicago*, 278 Ill. 318, 325, 116 N. E. 158; see *United States* v. *United Mine Workers*, 330 U. S. 258, 290, 67 S. Ct. 677, 91 L. Ed. 884. Other cases not published in the official reports are discussed in National Institute of Municipal Law Officers Report No. 129 (1949) pp. 20-28. The court puts the matter succinctly in the *Miami* case, supra: "While strikes are recognized by the statute to be lawful under some circumstances, it would seem that a strike against the city would amount, in effect, to a strike against government itself—a situation difficult to reconcile with all notions of government."

The plaintiff, recognizing the unreasonableness of its claims in the case of such employees as the militia and the judiciary, seeks to place teachers in a class with employees employed by the municipality in its proprietary capacity. No authority is cited in support of this proposition. "A town board of education is an agency of the state in charge of education in the town. . . . " *Board of Education of Stamford* v. *Board of Finance*, 127 Conn. 345, 349, 16 A. 2d 601. In fulfilling

its duties as such an agency, it is acting in a governmental, not a proprietary, capacity. *Seymour v. Over-River School District*, 53 Conn. 502, 3 A. 552, cited by the plaintiff, does not hold to the contrary. It went no further than to hold that a teacher was not a "public officer" within the meaning of a statute authorizing the garnishment of wages.

In the American system, sovereignty is inherent in the people. They can delegate it to a government which they create and operate by law. They can give to that government the power and authority to perform certain duties and furnish certain services. The government so created and empowered must employ people to carry on its task. Those people are agents of the government. They exercise some part of the sovereignty entrusted to it. They occupy a status entirely different from those who carry on a private enterprise. They serve the public welfare and not a private purpose. To say that they can strike is the equivalent of saying that they can deny the authority of government and contravene the public welfare. The answer to question (e) is "No."

Questions (a) and (b) relate to the right of the plaintiff to organize itself as a labor union and to demand recognition and collective bargaining. The right to organize is sometimes accorded by statute or ordinance. See, for example, the Bridgeport ordinance adopted June 17, 1946 (Bridgeport Munic. Reg. [1947] p. 15), discussed in National Institute of Municipal Law Officers Report No. 129, p. 51. The right to organize has also been forbidden by statute or regulation. *Perez v. Board of Police Commissioners*, 78 Cal. App. 2d 638, 178 P. 2d 537. In Connecticut the statutes are silent on the subject. Union organization in industry is now the rule rather than the exception. In the absence of prohibitory statute or regulation, no good reason appears why public employees should not organize as a

labor union. *Springfield* v. *Clouse*, 356 Mo. 1239, 1246, 206 S. W. 2d 539. It is the second part of question (a) that causes difficulty. The question reads: "Is it permitted to the plaintiff under our laws to organize itself as a labor union for the purpose of demanding and receiving recognition and collective bargaining?" The question is phrased in a very peremptory form. The common method of enforcing recognition and collective bargaining is the strike. It appears that this method has already been used by the plaintiff and that the threat of its use again is one of the reasons for the present suit. As has been said, the strike is not a permissible method of enforcing the plaintiff's demands. The answer to questions (a) and (b) is a qualified "Yes." There is no objection to the organization of the plaintiff as a labor union, but if its organization is for the purpose of "demanding" recognition and collective bargaining the demands must be kept within legal bounds. What we have said does not mean that the plaintiff has the right to organize for all of the purposes for which employees in private enterprise may unite, as those are defined in § 7391 of the General Statutes. Nor does it mean that, having organized, it is necessarily protected against unfair labor practices as specified in § 7392 or that it shall be the exclusive bargaining agent for all employees of the unit, as provided in § 7393. It means nothing more than that the plaintiff may organize and bargain collectively for the pay and working conditions which it may be in the power of the board of education to grant.

Questions (c) and (d) in effect ask whether collective bargaining between the plaintiff and the defendant is permissible. The statutes and private acts give broad powers to the defendant with reference to educational matters and school management in Norwalk. If it chooses to negotiate with the plaintiff with regard to

the employment, salaries, grievance procedure and working conditions of its members, there is no statute, public or private, which forbids such negotiations. It is a matter of common knowledge that this is the method pursued in most school systems large enough to support a teachers' association in some form. It would seem to make no difference theoretically whether the negotiations are with a committee of the whole association or with individuals or small related groups, so long as any agreement made with the committee is confined to members of the association. If the strike threat is absent and the defendant prefers to handle the matter through negotiation with the plaintiff, no reason exists why it should not do so. The claim of the defendant that this would be an illegal delegation of authority is without merit. The authority is and remains in the board. This statement is not to be construed as approval of the existing contracts attached to the complaint. Their validity is not in issue.

As in the case of questions (a) and (b), (c) and (d) are in too general a form to permit a categorical answer. The qualified "Yes" which we give to them should not be construed as authority to negotiate a contract which involves the surrender of the board's legal discretion, is contrary to law or is otherwise ultra vires. For example, an agreement by the board to hire only union members would clearly be an illegal discrimination. *Mugford* v. *Baltimore*, 185 Md. 266, 270, 44 A. 2d 745; Rhyne, Labor Unions & Municipal Employe Law, pp. 34, 137, 157. Any salary schedule must be subject to the powers of the board of estimate and taxation. "The salaries of all persons appointed by the board of education . . . shall be as fixed by said board, but the aggregate amount of such salaries . . . shall not exceed the amount determined by the board of estimate and taxation. . . . " 21 Spec. Laws 285, No. 315, § 3;

*Board of Education of Stamford* v. *Board of Finance,*
127 Conn. 345, 349, 16 A. 2d 601. One of the allega-
tions of the complaint is that the solution of the par-
ties' difficulties by the posing of specific issues is not
satisfactory. Whether or not this is so, that course will
be necessary if this discussion of general principles is
an insufficient guide.

Question (f) reads, "Is arbitration a permissible
method under Connecticut law to settle or adjust dis-
putes between the plaintiff and the defendant?" The
power of a town to enter into an agreement of arbitra-
tion was originally denied on the ground that it was
an unlawful delegation of authority. *Griswold* v. *North
Stonington,* 5 Conn. 367, 371. It was later held that
not only the amount of damages but liability could be
submitted to arbitration. *Hine* v. *Stephens,* 33 Conn.
497, 504; *Mallory* v. *Huntington,* 64 Conn. 88, 96, 29 A.
245. The principle applies to the parties to the case at
bar. If it is borne in mind that arbitration is the result
of mutual agreement, there is no reason to deny the
power of the defendant to enter voluntarily into a con-
tract to arbitrate a specific dispute. On a proposal for
a submission, the defendant would have the opportu-
nity of deciding whether it would arbitrate as to any
question within its power. Its power to submit to ar-
bitration would not extend to questions of policy but
might extend to questions of liability. Arbitration as a
method of settling disputes is growing in importance
and, in a proper case, "deserves the enthusiastic support
of the courts." *International Brotherhood of Teamsters*
v. *Shapiro,* 138 Conn. 57, 69, 82 A. 2d 345. Agreements
to submit all disputes to arbitration, commonly found
in ordinary union contracts, are in a different category.
If the defendant entered into a general agreement of
that kind, it might find itself committed to surrender
the broad discretion and responsibility reposed in it by

law. For example, it could not commit to an arbitrator the decision of a proceeding to discharge a teacher for cause. So, the matter of certification of teachers is committed to the state board of education. General Statutes §§ 1432, 1433, 1435. The best answer we can give to question (f) is, "Yes, arbitration may be a permissible method as to certain specific, arbitrable disputes."

From what has been said, it is obvious that, within the same limitations, mediation to settle or adjust disputes is not only permissible but desirable. The answer to question (g) is "Yes." The state board of mediation and arbitration and the state labor relations board, however, are set up to handle disputes in private industry and are not available to the plaintiff and defendant for reasons given in the opinion of the attorney general dated July 6, 1948. 25 Conn. Atty. Gen. Rep. 270. This was confirmed as to Norwalk teachers by an opinion dated June 12, 1950, not yet published. See also *United States* v. *United Mine Workers,* 330 U. S. 258, 269, 67 S. Ct. 677, 91 L. Ed. 884. The answer to question (h) is "No."

General Statutes, Sup. 1949, § 160a, provides in part: "The contract of employment of a teacher shall be renewed for the following school year unless such teacher has been notified in writing prior to March first of that year that such contract will not be renewed." Question (i) asks whether this law creates "a status of employment within which the plaintiff may claim employment subject to the right to bargain salaries and working conditions?" The meaning of this is not clear and the briefs do not clarify it. It is the type of question that should be related to a specific state of facts. It cannot be answered in vacuo.

As to question (j), the plaintiff has no right to establish rules. As stated above, the right is and remains in the board.

Question (g) is answered, "Yes, but not under chapter 369 of the General Statutes as amended." Questions (e), (h) and (j) are answered "No." Question (i) is not answered. No purpose would be served by answering the other questions categorically. Questions (a) and (b) are answered, "Yes, with relation to the plaintiff's own members, provided its demands are kept within legal bounds." Questions (c) and (d) are answered, "Yes, with relation to the plaintiff's own members, provided that this answer shall not be construed as approval of any specific contract which has been or may be entered into between the parties." Question (f) is answered, "Yes, arbitration may be a permissible method as to certain specific, arbitrable disputes." In answering some of these questions we have gone beyond the requirements of the specific questions asked in order to render such assistance as we properly may in helping to solve the difficulties of the parties.

No costs will be taxed in this court to either party. In this opinion the other judges concurred.